Filed 8/26/15  P. v. Zamora CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B252960 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA129652) |
| v. | |
| ANTHONY MOSES ZAMORA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Patrick T. Meyers, Judge.  Affirmed in part and reversed in part.

Sarah A. Stockwell, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief  Assistant Attorney General, Lance E. Winters, Senior Assistant Deputy Attorney General, Margaret E. Maxwell, Supervising Deputy Attorney General, and Eric E. Reynolds, Deputy Attorney General, for Plaintiff and Respondent.

_____

Anthony Moses Zamora appeals from his convictions for robbery (count 1), criminal threats (count 2) and false imprisonment (count 3). He maintains the trial court violated his rights to due process and a fair trial by admitting excerpts of phone calls he made from jail in an effort to locate favorable witnesses or, in the alternative, that he received ineffective assistance of counsel. Zamora also argues that because the crimes of false imprisonment and criminal threat occurred in the course of the robbery as part of a continuous course of conduct, his sentence on counts 2 and 3 must be stayed under Penal Code section 654.[1] We conclude that the latter contention has some merit, and remand the matter to the trial court with directions to stay Zamora's sentence on count 3. We reject Zamora's further contentions of error and, in all other respects, affirm.

## PROCEDURAL BACKGROUND

In a three-count information, Zamora was charged with second degree robbery (§ 211; count 1), criminal threats (§ 422, subd. (a); count 2), and kidnapping with intent to commit robbery (§ 209, subd. (b)(1); count 3). As to each count, Zamora was also alleged to have personally used a deadly weapon, specifically, a knife (§12022, subd. (b)(1)). Further, it was alleged that Zamora had suffered a prior serious felony conviction (§ 667, subd. (a)(1)), a prior strike conviction (§§ 667, subds. (b)-(i), 1170.12), and three prior prison terms (§ 667.5, subd. (b)). Zamora pleaded not guilty and denied the allegations.

A jury found Zamora guilty as to counts 1 and 2. It found him not guilty as to count 3, but guilty of false imprisonment, a lesser included offense of kidnapping with intent. The jury found the allegation regarding personal use of a deadly weapon not true. Zamora admitted the prior convictions allegations.

Zamora was sentenced to a prison term of 17 years and eight months, calculated as follows: Upper term of five years on count one, doubled as a result of the strike prior, plus consecutive one-third of the midterm on counts 2 and 3, doubled for an additional 16

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

months on each count, plus five years for the prior serious felony conviction. Zamora was ordered to pay various fees and fines and received custody credit. Zamora filed this timely appeal.

## FACTUAL BACKGROUND

*Prosecution evidence*

At 11:30 a.m., on March 21, 2013,[2] Aracely Flores was working alone, organizing boxes at her family's store, Que Barrato, in Norwalk. Zamora came into the store and offered to help Flores, who accepted the offer.[3] Zamora helped Flores for about an hour, during which time Flores's boyfriend, Cesar Aviles came in to visit, several customers came in to make purchases and one person sold some gold to Flores. Zamora had been eating a cup of noodles when he came into the store and Flores offered him a soda, which he drank. Zamora threw his empty noodle container in the trash and left the soda can on a display case.

Before leaving, Zamora asked Flores to change a $100 bill. As she opened the register to make change for Zamora, Flores felt a knife on her neck. Zamora placed Flores in a chokehold, told her not to move and said he would not hurt her. Flores estimated that Zamora took over $1,000 from the cash register and the store's gold sales, which were kept in a box under the register. Holding the knife to her throat, Zamora walked Flores to a restroom in the rear of the store and pushed her inside. He closed the door, told her to remain inside and threatened to return to kill her if she called the police. Flores locked the door and remained inside the restroom about 25 minutes. When she emerged, Flores pushed a "panic button" near the cash register, summoning the Los Angeles Sheriff's Department (LASD).

---

[2] All date references are to 2013.

[3] Flores and her father regularly let homeless individuals help around the store to earn some cash, and she had seen Zamora at the store several times before March 21.

3

Flores was standing outside the store—hysterical and frightened—when deputies arrived. She explained what happened and, later, showed a deputy the empty food and drink containers. Subsequent testing of the soda can and noodle cup revealed that Zamora's DNA matched DNA samples recovered from the cup and can.

A few days after the robbery, deputies recovered video footage for the relevant time period from a surveillance system at Lupita's Meat Market, next door to Que Barrato, which showed Zamora in the market. An attempt to recover video footage from the surveillance system at Que Barrato was not successful; the store's system was not programmed to record.

An LASD detective interviewed Zamora on April 11. An audio recording of that interview was played for the jury. During that interview, Zamora denied having ever been in Flores's store. He had been in Lupita's Meat Market in the past, but never purchased a cup of noodles there.

*Defense Case*

Zamora testified in his own defense. On March 21, he went to Lupita's Meat Market (carrying a cup of noodles from home) and bought a soda. He returned home, added hot water to the noodles and carried the food to a gas station to buy cigarettes. He then walked through the shopping center in which Que Barrato is located, and stopped in to say hello to Flores. Zamora testified that he and Flores had a sexual relationship, and had "fool[ed] around" (engaged in oral sex) at Que Barrato 10 to 15 times.

When Zamora went into Que Barrato on March 21, Flores was behind the counter on which Zamora set his noodle cup. The two talked for a few minutes. Zamora offered to help Flores move boxes, which they did for 30 to 45 minutes until Aviles came into the store. Flores and Aviles argued, but Zamora did not hear what they were saying. After Aviles left, Flores said she and her boyfriend had argued because Zamora was there.

Flores asked Zamora if he wanted a drink and took him to a back room where the sodas were located. They engaged in oral sex. Afterwards, Zamora and Flores "hung out," and watched part of a movie together. Halfway through the movie, Zamora said he had to leave, asked Flores if she was going to pay him for his work and requested $20 to

$40.  Flores gave Zamora $50 from the store's register and he left.  Zamora never put a knife to Flores's throat and did not take any money from the store.  Zamora admitted that he had lied when he told the LASD detective that he had never been to Que Barrato.  He did so because he does not trust law enforcement.

*Rebuttal*

Flores denied having had an intimate relationship with Zamora.  She never hugged, kissed, touched or performed oral sex on Zamora.  Aviles testified that he drove Flores to Que Barrato around 11:00 a.m. on March 21.  He returned to the store about 45 minutes later and saw Zamora moving boxes.  Aviles recognized Zamora from seeing him around the shopping center on prior occasions.  Aviles testified that he and Flores had not argued.

## DISCUSSION

1.      *Forfeiture of objections to admission of calls from jail*

Zamora contends the trial court erred in admitting into evidence excerpts of phone calls he made from jail to his father and to a friend.  He maintains the evidence should have been excluded as unduly prejudicial under Evidence Code section 352, and that its admission violated his constitutional rights to due process and a fair trial.  We conclude that Zamora forfeited his claim of error on appeal by failing to object to the evidence at trial.

        a.      *The relevant proceedings*

Trial began with jury selection on October 22.  On October 24, shortly before resting his case, the prosecutor informed the court a detective had obtained recordings of phone calls Zamora had made from jail on October 22 to his father and another individual.  The prosecutor indicated that his office had only received the recordings that morning, and he had given copies to Zamora's counsel.  The prosecutor stated his intention to use statements Zamora made during those recorded calls for impeachment if Zamora testified.

Zamora's counsel responded that he had not had an opportunity to review or investigate the recordings, and objected to their admission because of the late date of

production.  The prosecution responded that the recordings were of calls made just as trial (voir dire) began, which could not have been produced earlier.  He argued the recordings were relevant to Zamora's credibility and admissible as party admissions.  The court reserved ruling.

The subject of the admissibility of the calls arose again during Zamora's testimony.  At issue were five excerpts (clips) from two calls Zamora made on October 22.  Zamora made the first call to his father ("Pops"), and the second to a man named Fidel.  Zamora's counsel objected only to the admission of clip Nos. 1 and 4.  Defense counsel withdrew his prior objections to the remaining clips, informing the court:  "Your Honor, now that I looked at the clips, [the prosecutor] wants to play these. It's fine with me.  They're totally innocuous.  I don't understand why the People want to play these.  In fact, some of it helps me."  The court excluded clip No. 4, finding that its prejudicial effect outweighed its probative value.  The remaining clips were deemed admissible.[4]

During cross-examination of Zamora, the prosecutor played three clips from an October 22nd call Zamora made to his father (clip Nos. 1-3; Exhs. 11A-C).  In those recordings, Zamora asks his father to find two unnamed witnesses who can testify they saw Zamora and Flores together.  He also asks his father to contact "Fidel" about finding the witnesses and says Fidel knows Zamora needs the witnesses to testify.  The prosecutor also played an excerpt from the call Zamora made to Fidel ("phone call # 2"; Ex. 11D) after speaking with his father, in which he asked Fidel "to go look for"—but does not identify—"witnesses" to testify that he and Flores had a relationship.  During rebuttal, Zamora's counsel played the recording of Zamora's call to Fidel (phone call #2; Ex. 11D) in its entirety for the jury.

---

[4] The record contains transcripts only of clip Nos. 1, 2 and 3.  There is no transcript for clip Nos. 4 (which was excluded) or 5, presumably because the record contains a transcript of the entire conversation between Zamora and Fidel (from which clip No. 5 was excerpted), played for the jury by Zamora's counsel.

**DISCUSSION**

*1.      Zamora's forfeiture of objections to audio recordings*

Zamora contends he objected to admission of all of the recordings in the trial court, and that their erroneous admission violated his rights to a fair trial and due process. However, the record reflects that Zamora objected only to clip Nos. 1 and 4, and explicitly withdrew any objections to the remainder.

When the prosecutor first brought the recordings of Zamora's jailhouse calls to the attention of the court and counsel, Zamora's attorney objected that the recordings were produced too late, and he lacked time to investigate or to "put things in context." After reviewing the prosecutor's summaries of the content of the calls, Zamora's counsel objected to admission of the tapes on the ground that the material was "not exculpatory because it's the same things [Zamora has] asked [counsel] to do. He wants to get witnesses to court, and that's what he's talking about. But there is a possibility that someone can interpret this fraudulently [sic] creating witnesses. I don't want that possibility. So it's just too late." Later, after actually reviewing the five specific clips the prosecution planned to offer, Zamora's counsel limited his objections to two clips. He argued clip No. 1 would "open a can of worms" because it contained references to discussions he and Zamora had regarding trial tactics, and might require counsel to testify at trial. Zamora's counsel also objected to clip No. 4 as speculative under Evidence Code section 352, observing that Zamora could be referring in the call to a different criminal case, and expressing concern that it "might open the door."

However, as to the three remaining clips, Zamora's counsel explicitly withdrew any objections, stating that "if [the prosecutor] wants to play the others or inquire about the others, *that's fine*." (Italics added.) Based on his review of the clips, counsel concluded "[t]hey're totally innocuous. I don't understand why the People want to play these. In fact, some of it helps me." Apart from relevance and foundational objections raised and overruled before the clips were played, Zamora's counsel posed no further objections. Notably, he never objected to any clip on constitutional grounds. The trial

7

court excluded clip No. 4, but overruled the objections to clip No. 1 (although it assured Zamora's counsel he could "put [testifying] out of [his] mind]").

As a general rule, failure to raise a claim of a constitutional violation in the admission of evidence at trial forfeits the claim on appeal. "'[A] defendant must make a specific objection on [constitutional] grounds at the trial level in order to raise a [constitutional] claim on appeal.' [Citations.]" (*People v. Mattson* (1990) 50 Cal.3d 826, 854, superseded by statute on another ground in *People v. Jennings* (1991) 53 Cal.3d 334, 387, fn. 13; *People v. Boyette* (2002) 29 Cal.4th 381, 424 (*Boyette*) [specificity is necessary to enable the court to make an informed ruling and to enable party proffering the evidence to cure evidentiary defect].) Under Evidence Code section 353, subdivision (a), we may not "grant relief on a claim that evidence was erroneously admitted unless a timely objection was made 'and so stated as to make clear the specific ground of the objection or motion.' '"What is important is that the objection fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling."'" (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1214; *Boyette*, at p. 424.)

Zamora's failure to assert a federal constitutional objection to admission of the recordings constitutes forfeiture of his right to assert new due process and fair trial claims on appeal. (*People v. Brown* (2003) 31 Cal.4th 518, 546 [defendant's claim that trial court's failure to limit prosecutor's use of gang evidence violated his constitutional rights forfeited for failure to object on those grounds; *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1028 & fn. 19 [objection at trial based on state law grounds is not adequate to preserve a federal Constitutional claim]; *People v. Burgener* (2003) 29 Cal.4th 833, 886 [failure to object on federal constitutional grounds at trial constitutes forfeiture].

2.      *No ineffective assistance of counsel*

Zamora argues that if we find, as we have, that he forfeited his constitutional objections by failing to raise them in the trial court, we must also find he received

ineffective assistance of counsel because there is no satisfactory explanation for his trial counsel's failure to object to each audio clip offered by the prosecution. We disagree.

When a defendant raises a claim of ineffectiveness of counsel, he must establish both that his "'counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and there is a reasonable probability that, but for counsel's unprofessional errors and/or omissions, the trial would have resulted in a more favorable outcome.'" (*In re Cudjo* (1999) 20 Cal.4th 673, 687; *People v. Ledesma* (1987) 43 Cal.3d 171, 217–218 (*Ledesma*).)

Although claims of ineffective representation based on a failure to object are cognizable on appeal, the bar is high. "Failure to object rarely constitutes constitutionally ineffective legal representation [citation]." (*Boyette*, *supra*, 29 Cal.4th at p. 424.) The California Supreme Court has "repeatedly stressed 'that "[if] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected.'" (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266.) It must appear "that the omission or omissions were not attributable to a tactical decision which a reasonably competent, experienced criminal defense attorney would make. [Citation.]" (*People v. Williams* (1988) 44 Cal.3d 883, 936.) This principle of deferential scrutiny on appeal is predicated, in part, on the dangers of second-guessing in cases where claims of ineffective assistance are made. "'[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.'" (*Ledesma*, *supra*, 43 Cal.3d at p. 216, quoting *Strickland v. Washington* (1984) 466 U.S. 668, 689 [104 S.Ct. 2052, 80 L.Ed.2d 674] (*Strickland*).) Second-guessing the judgment of a defendant's trial counsel could adversely affect both the quality of defense counsel and the functioning of criminal trials, because defense attorneys might be tempted to make decisions, not because they believe a tactical decision best serves their client, but driven by a desire preemptively to defend themselves against a posttrial claim of ineffective representation. (*Ledesma*, at p. 216.)

9

In reviewing a claim of ineffective assistance, we defer to an attorney's reasonable tactical decisions. "'"[T]here is 'a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" [Citations.]'" (*People v. Jones* (2003) 29 Cal.4th 1229, 1254.) An attorney's tactical decisions must be evaluated in the context of the available facts. "'[I]n the usual case, where a counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions. [Citations.]'" (*Ibid.*)

In order to show ineffective assistance, Zamora must establish that: (1) trial counsel's performance fell below prevailing professional standards of reasonableness; and (2) there is a reasonable probability that but for counsel's unprofessional errors, the outcome of the case would have been different. (*Ledesma*, *supra*, 43 Cal.3d at pp. 216–218; *People v. Hart* (1999) 20 Cal.4th 546, 623–624 (*Hart*).) Under *Strickland*, *supra*, 466 U.S. 668, a reviewing court need not assess these two factors in order, and may choose to examine the issue of resulting prejudice before or even without reaching the issue of competent representation. (*Id.* at p. 697.) Indeed, it may be preferable to do so. (*Ibid.*) The same approach is followed in California. (See *In re Cox* (2003) 30 Cal.4th 974, 1019.) Following this guidance, we briefly address the issue of error. Zamora maintains there was no justifiable basis for his trial attorney not to have objected to the admission of all excerpts from his calls. On the contrary, as reflected in his closing— responding to the prosecution's implication that Zamora manufactured a defense by looking for someone to testify falsely about his nonexistent relationship with Flores— Zamora's defense counsel reasonably concluded the calls buttressed a legitimate defense. He could conclude that, in making the calls, Zamora was merely asking people whom he trusted to do the same thing he had asked his attorney to do—round up knowledgeable witnesses to testify and support his defense. Based on this record, we cannot say that counsel's decision not to object was so deficient as to deprive Zamora of his right to effective assistance. Further, any objections Zamora's trial counsel may have posed to the recordings would have been overruled as meritless. The court found the recordings

relevant on the issue of Zamora's credibility and also found their probative value outweighed any prejudice to him. Accordingly, his claim of ineffective representation fails.

Even if we conclude Zamora's argument had succeeded, no prejudice has been shown. The defendant bears the burden to show he suffered prejudice as a result of ineffective assistance of counsel. To prevail on a claim of ineffective assistance of counsel, a defendant must establish both deficient performance, i.e., representation below an objective standard of reasonableness, and resultant prejudice. (*Hart*, *supra*, 20 Cal.4th at p. 623.) Prejudice must be affirmatively shown; "'the record must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."'" (*Id*. at p. 624.) "A court must indulge a strong presumption that counsel's acts were within the wide range of reasonable professional assistance. [Citation.]" (*People v. Dennis* (1998) 17 Cal.4th 468, 541.) Zamora's showing falls short of this standard.

Finally, Zamora cannot establish that it is reasonably probable he would have obtained a better result had the recordings been excluded. There is no reasonable probability the outcome of the trial would have been more favorable for Zamora had his counsel objected to the recordings. Absent prejudice there can be no viable claim of ineffective assistance of counsel. The jury heard Flores's and Zamora's conflicting testimony as to whether they had had an intimate relationship. The recordings, which reasonably could be interpreted as Zamora's counsel stated, could not have caused Zamora prejudice. Zamora's testimony put before the jury the issues about which he complains. Simply stated, Zamora was not convicted because his counsel was ineffective, but because the jury found overwhelming evidence of his guilt.

3.     *Stay of sentence for continuous course of conduct*

Zamora argues that the criminal threats against and false imprisonment of Flores were merely incidental to the store robbery, and that all of his actions were undertaken with a goal of achieving one overarching objective:  to steal the store's cash and get

11

away.  Accordingly, he contends that section 654 requires that the sentences on the criminal threat and false imprisonment convictions in counts 2 and 3 be stayed.

> ### a. *Controlling principles*

Punishment for multiple crimes arising from a single, indivisible course of conduct is prohibited.  "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  (§ 654, subd. (a); *People v. Jones* (2012) 54 Cal.4th 350, 353; *People v. Latimer* (1993) 5 Cal.4th 1203, 1207 (*Latimer*).)  Put differently, where multiple crimes are merely incidental to, or the means of accomplishing or facilitating one objective, a defendant may be punished only once.  (*Latimer*, at p. 1208.)  But if a defendant had separate objectives that were either (1) consecutive even if similar or (2) different even if simultaneous, multiple punishments are permissible, even if the crimes shared common acts or were parts of an otherwise indivisible course of conduct.  (*Latimer*, at pp. 1211–1212; *People v. Britt* (2004) 32 Cal.4th 944, 952.)  The purpose of section 654 is to insure the defendant's punishment is commensurate with culpability.  (*Latimer*, at p. 1211.)

The divisibility of a course of criminal conduct "'depends on the intent and objective of the actor.'"  (*People v. Correa* (2012) 54 Cal.4th 331, 336.)  "'If all the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' [Citation.]"  (*People v. Kwok* (1998) 63 Cal.App.4th 1236, 1253.)  "Whether section 654 applies in a given case is a question of fact for the trial court . . . .  [Citations.]  Its findings will not be reversed on appeal if there is any substantial evidence to support them."  (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143; *People v. Osband* (1996) 13 Cal.4th 622, 730.)  Trial courts have broad latitude in determining whether section 654 applies factually to a given series of offenses.  (*Jones*, at p. 1143.)

*b.      The robbery and false imprisonment, but not the criminal threats, were part of a continuous course of conduct*

At sentencing, the trial court rejected Zamora's argument that section 654 applied to the criminal threats and false imprisonment counts because those offenses were merely part of the robbery, and lacked an independent objective. Instead, the court agreed with the prosecutor that, although nothing prevented Zamora from completing the robbery and simply leaving the store, he chose instead to escalate the situation. In sum, the court found the crimes involved more than one objective. (*People v. Osband*, *supra*, 13 Cal.4th at p. 730.) The court also found persuasive Flores's testimony that she had been terrified by Zamora's threat to kill her if she reported the robbery.

The Attorney General argues that evidence of diverse objectives as to all the crimes is found in the fact that the offenses were separated in time. After holding a knife to Flores's throat and getting the cash from the register and gold sales, nothing stopped Zamora from completing the robbery and leaving the store. Instead, Zamora escalated the situation by forcing Flores to the back of the store, shutting her in the restroom and threatening to return to kill her if she reported the crime. The Attorney General insists that, between the robbery, the forcible imprisonment and his threats against Flores, Zamora had the "opportunity to reflect and to renew his . . . intent before committing the next [crime], thereby aggravating the violation of public security or policy already undertaken." (*People v. Gaio* (2000) 81 Cal.App.4th 919, 935.) Accordingly, multiple punishment is appropriate to insure that Zamora's punishment be commensurate with his culpability. The Attorney General insists there is sufficient evidence to support a finding that Zamora had multiple objectives, and his actions were divisible as to intent and time. (*People v. Beamon* (1973) 8 Cal.3d 625, 639, fn. 11.)

The Attorney General contends that the count for false imprisonment warrants separate punishment because it was separated in time from the robbery, in that there was no impediment to Zamora completing the robbery by simply taking the money and leaving the store. Instead, he unnecessarily escalated the situation by taking Flores, at knifepoint, to the rear of the store and shutting her in the restroom. The Attorney General

contends that, after the robbery, Zamora had an "opportunity to reflect and to renew his . . . intent before committing the [false imprisonment], thereby aggravating the violation of public security or policy already undertaken." (*People v. Gaio*, *supra*, 81 Cal.App.4th at p. 935.) Relying on *People v. Nguyen* (1988) 204 Cal.App.3d 181 (*Nguyen*), the Attorney General argues the act of forcing Flores into the restroom at knifepoint, was an act of "gratuitous violence or other criminal act[] far beyond those reasonably necessary to accomplish the original offense." (*Id*. at p. 191.)

We cannot agree. In *Nguyen*, *supra*, 204 Cal.App.3d 181, defendant Nguyen stole money from a store's cash register while his accomplice took the store clerk to a rear bathroom, stole property from the clerk's pockets and forced him to lie face down on the floor "in an obvious attempt to forestall any resistance." (*Id*. at p. 190.) As he lay on the floor the clerk heard Nguyen "shout a Vietnamese battle phrase used when 'someone was to kill or be killed,'" after which the accomplice kicked the clerk in the ribs and shot him in the back. (*Id*. at p. 185.) The court rejected Nguyen's argument that multiple punishments were unwarranted because the clerk had been shot only "to eliminate him as a witness or to facilitate the assailants' escape." (*Id*. at p. 191.)

*Nguyen*, *supra*, 204 Cal.App.3d 181 relied, in part, on *People v. Foster* (1988) 201 Cal.App.3d 20 (*Foster*), in which the defendant and a confederate committed a series of armed robberies of small stores and a gas station. On one occasion, after obtaining money from the store, they locked two store employees and a bystander in the store's cooler. The victims were able to escape by crawling out of the cooler through a drink display case. (*Foster*, at p. 23.) In addition to the sentence imposed for robbery, defendant was convicted and sentenced to consecutive terms on each of three counts of false imprisonment. (*Id*. at p. 27.) The court rejected defendant's argument that section 654 barred consecutive sentences because the false imprisonment of the three victims was merely incidental to the robbery. It concluded that the imprisonment "occurred *after* the robbers had obtained all of the money, and therefore was not necessary or incidental to committing the robbery. Locking the victims in the store cooler was potentially dangerous to their safety and health. It is analogous to a needless or vicious assault

14

committed after a robbery, which has long been held separately punishable and distinguishable from an assault which is merely incidental to robbery." (*Id.* at pp. 27–28.) "'An armed robber who needlessly and viciously maims and endangers the life of his victim, even after he has consummated the purpose of his original crime, certainly deserves more severe punishment than one who limits his criminal activity to the unlawful taking of the property of another.'" (*Id.* at p. 28.) The court in *Nguyen* acknowledged that other courts had reached contradictory conclusions under arguably similar circumstances,[5] and that "section 654 has not been applied consistently." (*Nguyen*, at p. 193.)

Neither *Foster*, *supra*, 201 Cal.App.3d 20 nor *Nguyen*, *supra*, 204 Cal.App.3d 181 requires consecutive sentencing here. Zamora neither endangered Flores's health or safety by confining her to a restroom (which was only locked from the inside by Flores herself to keep Zamora out), nor was Flores's captivity an act of gratuitous violence after the robbery. Rather, Zamora maintained control over Flores and kept her isolated in order to facilitate a successful robbery, by preventing her from summoning help before he was able to escape to a place of temporary safety. As the California Supreme Court recently clarified: "'"[T]he crime of robbery is not confined to the act of taking property from victims. The nature of the crime is such that a robber's escape with his loot is just as important to the execution of the crime as obtaining possession of the loot in the first

---

[5] See, e.g., *People v. Green* (1979) 95 Cal.App.3d 991. In *Green* the victim was accosted by several men as she approached her parked van. The men forced her to drive while they robbed her, then threw her from the vehicle as it sped down the freeway. The defendant was convicted of robbery, kidnapping, and attempted murder. (*Id.* at p. 1008.) The court found that section 654 barred consecutive sentences, at least in part, because the Attorney General conceded the offenses "were part of one indivisible transaction [in which] the primary criminal objective of each defendant was to rob the victim of her purse and vehicle." (*Ibid.*) The *Nguyen* court "simply disagree[d] with *Green*," "[t]o the extent *Green* stands for the proposition that a sentence for assault on a robbery victim to evade apprehension and prosecution may not be imposed along with the sentence for the robbery itself . . . ." (*Nguyen*, *supra*, 204 Cal.App.3d at p. 192.)

15

place.'" [Citation.] As a result, the commission of a robbery is ongoing "'until the robber has won his way to a place of temporary safety.'" [Citation.] A robber has not reached a place of temporary safety while an immediate and active pursuit to recover the property is in progress. [Citation.] Similarly, as long as a robber holds the victim captive, the robber's safety is 'continuously in jeopardy' during the period of captivity if at 'any unguarded moment, the victim might . . . escape or signal for help.'" (*People v. Debose* (2014) 59 Cal.4th 177, 205 (*Debose*); see *People v. Fields* (1983) 35 Cal.3d 329, 364 ["defendant might not have reached a place of temporary safety or attained unchallenged possession of the stolen property when he was still encumbered with [the victim], . . . who at first opportunity might call the police"].)

The Attorney General has not identified, and the evidence does not support the conclusion that Zamora harbored distinct objectives in committing the robbery and false imprisonment. The forced isolation of Flores was a means to accomplish a single objective: to commit a robbery and escape undetected. Having worked in Que Barrato on multiple occasions in the past, Zamora may well have known the store had a "panic button" to summon the LASD. At a minimum, he would understand that simply leaving Flores in the store after a robbery would almost certainly result in her placing an immediate 911 call. By taking her to the restroom, and ensuring she remained there for a time, Zamora did no more than he believed necessary to facilitate his successful escape.

However, we disagree with Zamora regarding the criminal threats conviction, as to which the court clearly found that Zamora's intent was not merely to control Flores's behavior to facilitate the crime, but directed at an independent additional goal of deterring her from making a future report to law enforcement. Under the circumstances, the trial court could reasonably find that Zamora committed the threats "with the intent and objective of preventing the victim from sounding the alarm about the [crime], and that this intent and this objective were separate from, not incidental to, the robbery." (*People v. Coleman* (1989) 48 Cal.3d 112, 162–163; see *Nguyen, supra,* 204 Cal.App.3d at pp. 185, 190 [accomplice's act of shooting clerk in back after putting clerk in a bathroom following robbery was unnecessary to facilitation of robbery and constituted gratuitous

act of violence worthy of separate punishment].)  If a defendant's crimes "were merely incidental to, or were the means of accomplishing or facilitating one objective, [the] defendant may be found to have harbored a single intent and therefore may be punished only once." (*People v. Harrison* (1989) 48 Cal.3d 321, 335.)  Multiple punishment is proper if the defendant entertained multiple independent criminal objectives.  (*Ibid.*)

The evidence discloses that Zamora's intent and objective in shutting Flores in the restroom after the robbery was to facilitate a successful escape.  The false imprisonment was thus incidental to the robbery and an indivisible course of conduct.  Because the record does not reflect that Zamora harbored separate and distinct objectives in committing the crime of isolating Flores, separate punishment is barred by section 654. (*People v. Hester* (2000) 22 Cal.4th 290, 294; *People v. Perez* (1979) 23 Cal.3d 545, 551.)  That is not the case however, with regard to the conviction as to count 2 for criminal threats.  The court implicitly found that Zamora threatened to kill Flores if she reported the robbery in order to ensure her silence in perpetuity.  Conduct intended to prevent discovery of a crime may be punished separately under section 654.  (*People v. Coleman*, *supra*, 48 Cal.3d at pp. 162–163.)  Accordingly, the judgment must be modified to reflect a stayed term only as to count 3.

# DISPOSITION

The trial court is directed to stay the sentence on count 3, pursuant to Penal Code section 654. The abstract of judgment shall be corrected to reflect the 10 year term imposed by the trial court on count 1, an additional 16 months on count 2, plus five years for the prior serious felony. The trial court is directed to prepare an amended abstract of judgment reflecting these modifications and to forward a copy to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED.

JOHNSON, J.

We concur:

CHANEY, Acting P. J.

BENDIX, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.